GALVESTON, H. & S. A. RY. CO. v. CRAIGHEAD. (No. 421.) †

(Court of Civil Appeals of Texas. El Paso. March 11, 1915. Rehearing Denied April 15, 1915.)

DAMAGES ☞130—PERSONAL INJURIES — EXCESSIVENESS.

In an action by a passenger against a railroad for personal injuries, where such passenger had been thrown by the sudden stopping of the train, striking with his shoulder and chest, breaking two ribs, etc., had suffered pain, and had been incapacitated for his work, which was

that of river guard for the government at a salary of $90 a month and $30 for horse feed, for not longer than two weeks, there being only slight probability that he would lose time from work in the future, a doctor, testifying that the probabilities were that the shoulder would be more or less impaired, although in the three months between the injury and the trial it had improved so as to enable plaintiff to saddle his horse, a verdict for $9,000 was excessive, and clearly the result of passion and prejudice.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 357–367, 370; Dec. Dig. ☞130.]

Appeal from District Court, Presidio County; W. C. Douglas, Judge.

Action by Charles A. Craighead against the Galveston, Harrisburg & San Antonio Railway Company. Judgment for plaintiff for $9,000, and defendant appeals. Reversed and remanded.

Beall, Kemp & Nagle, of El Paso, and Baker, Botts, Parker & Garwood, of Houston, for appellant. Belcher & Sutton, of Marfa, and Jones & Thurmond, of Del Rio, for appellee.

HARPER, C. J. This is a suit by Charles A. Craighead against the Galveston, Harrisburg & San Antonio Railway Company, to recover damages for personal injuries alleged to have been sustained by plaintiff while a passenger on one of defendant's trains. Plaintiff alleged that defendants' employés brought its passenger train to a sudden stop, and that he was thereby thrown against the arm or some other portion of the berth of the Pullman car, striking same with his right shoulder and chest, and that by reason of the severity of the impact, the shoulder, right arm, chest, and lungs, etc., were seriously and permanently injured. The defendant denied liability, and specially pleaded that if plaintiff received any injuries, they were neither serious nor permanent. The trial by jury resulted in a verdict and judgment for $9,000, from which this appeal is perfected.

The appellee objects to a consideration of appellant's assignments because they do not comply with the rules of this court. While, possibly, not strictly in compliance with the rules, they are sufficiently so to require us to pass upon them. In the five assignments there is really but one question raised, i. e., that the verdict is so excessive as to show that the jurymen were influenced in some other way than by the law and facts.

The testimony relied on to sustain the verdict is fully quoted as follows:

Plaintiff, Craighead:

"When the train stopped, it throwed me forward, and I struck something hard, and the effect it had on me was it hurt me. It numbed me for some little bit, it kind of made me sick. I didn't have good use of my arm. It was numbed. I tried to pick up a suit case with my right arm and could not do so. I picked up a hat box, with just a lady's hat with my right hand, and took a suit case in my left. I went straight home from the train. When I got home, the effect of the lick was it made me kind of sick. My shoulder swelled some, just

---

in a few minutes. I remained at home that morning, sent for Dr. Mahon about 10 o'clock, was hurt about 5 o'clock. The reason I did not send for a physician before was I didn't know there was anything broke. I just felt it was a jar, a bruise, and it wouldn't amount to much, tried treatment, first my wife rubbed some liniment on it. The pain had increased right smart before I sent for a doctor. When the doctor got there he told me there was a rib broken, bandaged it up, and the bandages remained on it for 12 days or two weeks. The effect of the injury is that I have no strength in the right arm. I can't do any heavy work or lifting. I can't handle a rope, can't use a Winchester from that shoulder, as I ought to, can't hardly saddle my horse; it is just here the last few days that I got so I can push saddle up, when I attempt to do that it hurts, it hurts any time I try to use it, it hurts all the time a little when I am riding, I haven't got very good use of the arm in handling it, lots of time I go to put my hand and miss what I go to put it on. I can't handle a pistol without I take both hands, and I can't get my pistol quick with that hand at all. I suffer pain at night; if I turn over on that shoulder at night it begins to ache right away and wakes me up, and I generally have to get up and sit up awhile. If I sleep sound all night I have to lay on my left side. I went back to work in 12 or 14 days after the injury. I haven't missed any time from my work. I am a river guard for the government, get $90 per month wages, and $30 per month for horse feed. There has been no complaint that I am not earning my wages."

The accident happened on April 15th, and judgment was entered August 18th, same year, 1914.

Dr. Hardy, for plaintiff:

"I know C. A. Craighead, the plaintiff in this case, and have made a physical examination of him. I examined him about two weeks ago in my office, and again this afternoon. At my examination of plaintiff two weeks ago I found there was atrophy of the scapular muscles and tenderness over the scapular and clavicular regions (the scapular is the shoulder blade and the clavicular the collar bone) and partial loss of function of the right shoulder joint, I mean that he is unable to use it fully, completely, and accurately. I found a difference in measurement from the median line over the right shoulder and the left; the difference I found was one inch; the right side was the smaller. The effect of atrophy of the muscles of the scapular would have on the arm and shoulder would depend on the degree of the atrophy, it would impair the usefulness of the shoulder and strength.

"Q. What was his ability to use the arm and his shoulder? A. The movements of the right arm were slow, evidently painful, and rather uncertain. I have examined the plaintiff with a view to determining the probable consequence of his condition, and my opinion is the probability is that he will never fully regain the use of his arm and shoulder; the probable effect is that his shoulder will be more or less impaired. I mean that it will be loss of strength, partial loss of functions of the shoulder and arm.

"Q. What effect do you think it will have in the future upon his ability to swing a rope in roping wild animals? A. Well, probably he will not be able to do it as skillfully as he once did. The probabilities are that the nerves of the arm have been permanently impaired.

"The reason I examined the patient was that he came to my office and requested me to do so, to my office at Alpine. Yes, sir; I examined him again to-day. No, sir; I have not been paid for my services yet. Yes, sir; pain is a subjective symptom. Yes, sir; we medical men have what we call objective symptoms and subjective symptoms. Objective symptoms are symptoms you can determine yourself; you are not limited though to seeing and feeling. Subjective symptoms are symptoms that you determine by what the patient tells you. Yes, sir; pain is principally a subjective symptom. Under certain circumstances, yes; you can look at a man or any portion of his anatomy and tell whether or not he is suffering. For instance, suppose that you have a painful shoulder, one that causes you pain when you move it; I can divert your attention and move that arm constantly, and I elicit pain before you have time to make up your mind whether you are going to suffer pain or not. No, sir; that is not just my idea about that. The reason I know that you haven't made up your mind is because I don't think you can make up your mind quite that quickly. No, sir; I deny that it is a fundamental primary principle of medicine that you can't tell whether a man is suffering pain, except what he tells you. It is not always a fact that you can only tell when a man is suffering by what he tells you. The reason I said that he evidently suffered pain instead of saying he did suffer pain is because in my profession, Mr. Kemp, we don't make absolute statements without absolute grounds for them. Yes, sir; I found slowness of motion, of movement; that is an objective symptom. Yes, sir; I could tell that by looking at him; I could tell it by looking at him by having him perform certain motions.

"Q. But after all, didn't he control his motions? A. Yes, sir.

"You remember that I didn't state definitely that there was a slowness of motion; I said that there was evidently. I meant to imply that the motions that I had had this man go through were performed with slowness and evident pain; I didn't say that he was absolutely unable to move otherwise than slowly. Certainly, so far as I know, Mr. Craighead could have made this movement slowly or he could have made it rapidly; that is true. Yes, of course, you could tell me that you were suffering pain, for instance, in your hip, and you may move your hip naturally or unnaturally, and I could not tell whether you were doing it purposely or not, but any good physician can tell whether you are assuming this movement or not; he can tell; he can trick you into it, you know; you can't keep up this deception always; you can't keep up the deception all through the examination. It is very difficult, yes, to tell whether a man is making motions voluntarily or involuntarily in a certain way.

"Q. And if I come and tell you that I have pain here in my hip, you have got to depend on what I say, haven't you? A. To begin with, yes.

"Well, yes, I would conclude that if you were telling me the truth something was wrong with the hip until I found out for myself; you could pretend that you had a pain whether you had or not, Mr. Kemp, but you would, certainly before a skillful physician would get through with you, he would determine whether you did or not; one of the simplest methods of determining is the one that I spoke of a while ago; assume that you did have; agree with you; divert your attention, and then suddenly make a movement that you describe that causes pain, and then by watching your expression, you being off guard, he could certainly determine whether you had pain; that is one of the methods. I think you would get off guard; yes, that is, assuming that you would get off guard. I said in answer to Mr. Thurmond's question that there would probably be always some impairment of the shoulder in his particular case; no, I wouldn't say as a fact there will be.

"Q. Even if you were correct in your diagnosis, he may ultimately recover? A. I am unable to state. My opinion, as stated by my answer to that question, is that he will probably have some loss of function, permanent loss of function. In

neuritis—you may have destruction of the nerve, in which, of course, the pain ceases, or the ultimate recovery of the nerve; with the destruction of the nerve other muscles possibly take some of the work, perform some of the work of the muscles, in which innovation has been destroyed.

"Q. He says now that he is better; he says now that he is in better position—to take his own testimony—that he can do more now than he ever could; he can put his saddle on his horse now, and for a while he couldn't. Wouldn't that indicate an improvement? A. Certainly, if before he couldn't put a saddle on his horse and now he can, that indicates improvement, yes.

"Q. If a man received a blow on the morning of the 15th of April severe enough to wrench the muscles of his right shoulder, right arm and shoulder and the tendons, ligaments and nerves, and it tore them and stretched them and lascerated them and shocked them, and it broke his shoulder blade and tore two of the ribs on his right side loose from the breast bone, that man would be badly injured, wouldn't he? A. He would be painfully injured, yes. Yes; he would be painfully injured.

"I don't know if he would feel like sending for a doctor pretty soon after the injury. It depends on how resistant he is to pain. I don't know if the average man with two ribs torn loose from the breast bone and a broken shoulder blade and his muscles wrenched and torn would be sending for a doctor pretty quick; I have seen them send for a physician for very much less injuries, and I have seen them fail to send for much greater. Sometimes tearing of the ribs from the breast bone is pretty painful; it depends on how much dislocation there is. I am totally unacquainted with the amount of the injury, of the original injury. If he can put his saddle on his horse now when some time ago he couldn't, it is a clear indication of improvement, that is, if he is doing it with the same shoulder certainly.

"Yes, sir; I made measurements of his shoulders and found a difference of one inch; I measured from the median line around the shoulder from the median line of one side, from the supersternal notch here to a point there, around the shoulder, then around on this side, and the left side is one inch greater in circumference than the right side. In my opinion, the cause of that was atrophy of the scapular muscles. The scapula is this big flat bone back here, the shoulder blade, yes.

"No, sir; as a matter of fact, human beings, as a rule, are not symetrical as a rule; yes, sir, we are all bigger on one side than on the other, and it is true that the bridge of our noses is not always in the middle, and one eye is closer to the middle of the nose than the other; yes, and probably almost invariably one leg is shorter than the other with most people. Yes; you often find a difference in the measurement of a man from his naval around one way and from his naval around the other way. One inch difference is probably not greater than it is frequently in normal men, this one inch difference. No, sir; there is not a difference in the size of the plaintiff's arms, no difference in the size of his arms."

We think the assignments must be sustained on the ground that the verdict cannot be accounted for by any reasonable view of the evidence. Giving full credence to the positive testimony of the plaintiff and Dr. Hardy, his injuries were to some extent serious, in the sense that they were painful, but .not such as to incapacitate him for labor, at least for longer than 12 or 14 days. There had been no loss of time from his occupation up to the time of the trial, and slight, if any, indication that there will be loss in the future in this respect. True, the doctor testified that the probabilities are that the. shoulder will be more or less impaired in the future, but in the three months' time between the injury and the trial it had so improved that he could push his saddle upon his horse, indicating a gradual and substantial improvement in its condition. There is no evidence in the record that the use of the arm will be further impaired than it now is, but the indications clearly are that it will continue to improve. In fact, at the time of the trial, a sufficient time had not elapsed to enable any one to determine the question of the probable permanency of the injury. The evidence and amount of the verdict clearly show that the jury was influenced by passion or prejudice.

The cause will therefore be reversed and remanded for a new trial.